**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VANESSA CHINN, Administrator of the Estate of Chad Michael Evangelista, Deceased, 8320 Long Road Canal Winchester, OH 43110<br><br>Plaintiff,<br><br>v.<br><br>FAIRFIELD COUNTY, OHIO c/o Fairfield County Board of Commissioners 210 East Main Street, Room 301 Lancaster, Ohio 43130<br><br>and<br><br>FAIRFIELD COUNTY BOARD OF COMMISSIONERS 210 East Main Street, Room 301 Lancaster, Ohio 43130<br><br>and<br><br>SHERIFF ALEX LAPE, in his official and individual capacities; c/o Fairfield County Sheriff's Office 345 Lincoln Avenue Lancaster, Ohio 43130<br><br>and<br><br>JARED COLLINS, Chief Deputy, Fairfield County Sheriff's Office, in his individual and official capacities; c/o Fairfield County Sheriff's Office 345 Lincoln Avenue Lancaster, Ohio 43130<br><br>and<br><br>SCOTT ERVIN, Chief Deputy, Fairfield County Sheriff's Office, | : | Case No. ________________<br><br>Judge: ________________<br><br>JURY DEMAND ENDORSED HEREON |

in his individual and official capacities; :
c/o Fairfield County Sheriff's Office :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :
:
and :
:
LIEUTENANT JEFFREY REED II, Fairfield County Jail Administrator, in his individual and official capacity :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :
:
and :
:
DEPUTY TYLER THOMSON, Badge FC486, in his individual capacity; :
c/o Fairfield County Sheriff's Office :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :
:
and :
:
CORRECTIONS OFFICER ROBERT KUNKLER, Badge CO 53, in his individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :
:
and :
:
CORRECTIONS OFFICER CODY FACTOR, Badge CO 86, :
in his individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :
:
and :
:
CORRECTIONS OFFICER LANDON TALBOTT, Badge CO 32, :
in his individual capacity; :
c/o Fairfield County Jail :

345 Lincoln Avenue :
Lancaster, Ohio 43130 :

and :

CORRECTIONS OFFICER BROCK :
VANHORN, Badge CO 77, :
in his individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :

and :

CORPORAL AUSTIN REEVES, Badge CO 19, :
in his individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :

and :

CORRECTIONS OFFICER SEAN :
BRENTLINGER, Badge CO 49, :
in his individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :

and :

JANE DOE SHIFT SUPERVISOR (female :
Fairfield County Jail shift supervisor, name and :
badge number redacted by the Ohio Bureau of :
Criminal Investigation; mandated 12-hour shift :
beginning 8:00 p.m. September 7, 2024), :
in her individual capacity; :
c/o Fairfield County Jail :
345 Lincoln Avenue :
Lancaster, Ohio 43130 :

and :

JOHN/JANE DOE DEPUTIES 1-10, :
in their individual capacities; :
(addresses unknown) :

and

JOHN/JANE DOE CORRECTIONS OFFICERS 1-10, in their individual capacities;
(addresses unknown)

and

JOHN/JANE DOE MEDICAL STAFF 1-5, in their individual capacities;
(addresses unknown)

and

PREMIER PHYSICIAN SERVICES, INC.,
c/o CORPORATION SERVICE COMPANY
1160 Dublin Rd., Ste. 400
Columbus, OH 43215

and

TEAMHEALTH, LLC,
c/o VIRTUALCARE MEDICAL GROUP, P.A.
265 BROOKVIEW CENTRE WAY STE 400
KNOXVILLE, TN 37919-4052

Defendants.

**COMPLAINT FOR DAMAGES**
**UNDER 42 U.S.C. § 1983, WRONGFUL DEATH, AND SURVIVAL CLAIMS**
**(JURY TRIAL DEMANDED)**

## INTRODUCTION

**1.** Plaintiff Vanessa Chinn, a citizen of the United States, as Administrator of the Estate of Chad Michael Evangelista, deceased, by and through the undersigned counsel, brings this civil rights action pursuant to 42 U.S.C. § 1983 and Ohio law against the above-named Defendants arising from the wrongful and preventable death of Chad Michael Evangelista, a 41-year-old man who died on September 9, 2024, one day after suffering cardiac arrest in the custody of the Fairfield County Jail, where he had been held for approximately

seventeen (17) hours without adequate medical care despite exhibiting obvious signs of a life-threatening medical emergency.

**2.** On September 7, 2024, Mr. Evangelista was observed in the roadway near 720 West Waterloo Street, Canal Winchester, Ohio, displaying signs of acute distress, including agitation, confusion, and erratic behavior. Law enforcement officers arrived and took Mr. Evangelista into custody. While in the custody of the arresting officers, and again upon his arrival at the Fairfield County Jail, Mr. Evangelista pleaded repeatedly for medical attention and to be taken to a hospital, and stated that he was having a heart attack. Rather than transport him to a hospital for medical evaluation, the arresting officers took him directly to the Fairfield County Jail, where he was booked on minor charges of Disorderly Conduct and Obstructing Official Business, processed as Canal Winchester Mayor's Court charges.

**3.** For the next seventeen hours, Mr. Evangelista was left in the Fairfield County Jail without medical attention while suffering from acute methamphetamine toxicity that caused rhabdomyolysis, metabolic acidosis, hyperkalemia, and progressive renal failure, all of which were treatable with standard medical interventions if diagnosed and treated promptly.

**4.** On the morning of September 8, 2024, Mr. Evangelista was found unresponsive and in cardiac arrest while incarcerated in the Fairfield County Jail. Despite resuscitation efforts, he died at Riverside Methodist Hospital on September 9, 2024.

**5.** The Defendants violated Mr. Evangelista's constitutional rights by acting with deliberate indifference to his serious medical needs. The arresting officers ignored his explicit pleas for medical help. The jail staff failed to provide adequate medical screening, monitoring,

or treatment during the critical hours when intervention could have saved his life. These failures were the direct and proximate cause of his death.

## PARTIES

***Plaintiff & Decedent***

**6.** At all times pertinent hereto, Plaintiff Vanessa Chinn ("Plaintiff"), was/is the duly appointed Administrator and personal representative of the Estate of Chad Michael Evangelista ("Decedent"), having been appointed by the Probate Court of Franklin County, Ohio. Case No. 641232. Plaintiff is the Decedent's mother. Plaintiff brings this action in her representative capacity pursuant to 42 U.S.C. § 1983, Ohio's Wrongful Death Act, Ohio Rev. Code §§ 2125.01 and 2125.02, and Ohio's Survival Statute, Ohio Rev. Code § 2305.21, to recover damages for the injuries and conscious pain and suffering Decedent endured prior to his death and for the benefit of Decedent's statutory beneficiaries and next of kin, who are rebuttably presumed to have suffered damages by reason of the wrongful death. Ohio Rev. Code § 2125.02(A)(1).

**7.** The Decedent, Chad Michael Evangelista, was born on January 4, 1983, and was 41 years old at the time of his death. He resided in Canal Winchester, Ohio. Prior to his untimely death, Decedent was an arrestee, inmate, and/or pre-trial detainee in the Fairfield County Jail (hereinafter "Jail"), a citizen of the United States of America, residing in the state of Ohio, and entitled to the protections of the Constitutions and laws of the United States of America and the State of Ohio including Due Process and the right to be free from cruel and unusual punishment.

***Defendants***

**8.** Defendant Fairfield County, Ohio ("the County") was/is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Southern District of Ohio, acting under the color of law, and was/is the governmental entity responsible for the operation, management, policies, customs, training, supervision, and discipline of all personnel of the Fairfield County Sheriff's Office and the Fairfield County Jail. The County is a "person" under 42 U.S.C. § 1983. The County was/is the employer and principal of all individual Defendants named in this Complaint and any other individual officers, guards, nurses, and medical staff at the Jail. The County owned, operated or otherwise controlled and is responsible for the Fairfield County Jail located at 345 Lincoln Ave, Lancaster, OH 43130 where the Decedent was an inmate and/or detainee on September 7, 2024 and September 8, 2024. The County is the proper party in interest for all claims asserted against the Fairfield County Sheriff's Office, which is not sui juris under Ohio law. The County is sued in its capacity as the policymaking body responsible for the constitutional violations alleged herein. To the extent required by Ohio law, the County is sued by and through the Fairfield County Board of Commissioners.

**9.** Defendant Fairfield County Board of Commissioners (hereinafter "Commissioners") was/is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Southern District of Ohio acting under the color of law, and was/is the governmental entity responsible for the operation, management, policies, customs, training, supervision, and discipline of all personnel of the Fairfield County Sheriff's Office and the Fairfield County Jail. Defendant Fairfield County Commissioners is a "person" under 42 U.S.C. § 1983. Defendant Fairfield County Commissioners was/is

the employer and principal of all individual Defendants named in this Complaint and any other individual officers, guards, nurses and medical staff at the Jail and is responsible for the policies, practices, and customs of the Jail. Defendant Fairfield County Commissioners owned, operated, or otherwise controlled and is responsible for the Fairfield County Jail located 345 Lincoln Ave, Lancaster, OH 43130 where the Decedent was an inmate and/or detainee on September 7, 2024 and September 8, 2024.

**10.** Defendant Fairfield County Sheriff (hereinafter "Sheriff" or "Sheriff's Office") is the office of the elected Sheriff of Fairfield County; claims against it are asserted against Fairfield County and against Sheriff Lape in his official capacity. The Sheriff, acting under color of law, was/is the governmental authority responsible for the operation, management, policies, customs, training, supervision, and discipline of all personnel of the Fairfield County Sheriff's Office and the Fairfield County Jail. The Sheriff, in his official capacity, is a "person" under 42 U.S.C. § 1983. The Sheriff was/is the employer and principal of all individual Defendants named in this Complaint and any other individual officers, guards, nurses and medical staff at the Jail and is responsible for the policies, practices, and customs of the Jail. The Sheriff owned, operated, or otherwise controlled and is responsible for the Fairfield County Jail located 345 Lincoln Ave, Lancaster, OH 43130 where the Decedent was an inmate and/or detainee on September 7, 2024 and September 8, 2024.

**11.** The Fairfield County Sheriff's Office and the Fairfield County Jail are administrative arms of Fairfield County and are not separate legal entities capable of being sued. To the extent any claim is asserted against them, it is asserted against Fairfield County and against Sheriff Lape in his official capacity. Because Fairfield County, the Fairfield County Board of Commissioners, and the Fairfield County Sheriff in his official capacity are one and the

same governmental entity for purposes of this action, they are hereinafter referred to collectively as "the County." Ohio Rev. Code § 305.12.

**12.** Fairfield County and all the Defendants listed herein operated the Jail and/or medical or mental healthcare at Fairfield County Jail located 345 Lincoln Ave, Lancaster, OH 43130 where the Decedent was an inmate and/or detainee on September 7, 2024 and September 8, 2024.

**13.** At all times pertinent hereto, Defendant Sheriff Alex Lape ("Lape") was/is the duly elected Sheriff of Fairfield County with responsibilities for the Jail. Lape is sued in both his official capacity and his individual capacity. As Sheriff, he is the chief law enforcement officer of Fairfield County and is responsible for the policies, practices, training, supervision, and discipline of all deputies and corrections officers under his command, as well as the policies governing medical care and monitoring of inmates at the Fairfield County Jail. At all times relevant hereto, Lape was acting in his official capacity, within the scope of his employment, under color of law, and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Lape acted with deliberate indifference to Decedent's obvious and serious needs for medical attention. Lape encouraged, authorized, approved, or knowingly acquiesced to the constitutional violations that lead to Decedent's and Plaintiff's damages.

**14.** At all times pertinent hereto, Defendant Jared Collins ("Chief Deputy Collins") was and is a Chief Deputy of the Fairfield County Sheriff's Office. As Chief Deputy, he was among the highest-ranking officers of the Sheriff's Office, held command authority over the Fairfield County Jail and over the deputies and corrections officers assigned to it, and was

responsible, together with Defendant Lape, for the promulgation, review, implementation, enforcement, and audit of the policies, practices, customs, and training governing medical receiving screening, well-being and safety checks, the use and time limits of the restraint chair, the deployment of chemical agents, and the summoning of medical care for and the transfer to a hospital of detainees at the Jail. Chief Deputy Collins is sued in both his official and individual capacities. At all relevant times he acted under color of law and within the scope of his employment. Upon information and belief, and prior to September 7, 2024, Chief Deputy Collins had actual knowledge of a persistent pattern of non-compliance at the Jail with the mandatory medical receiving-screening and observation requirements of Ohio Adm.Code 5120:1-8-09, and either authored or approved the policies pursuant to which his subordinates acted or knowingly permitted the absence of such policies to continue. Chief Deputy Collins was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death. Chief Deputy Collins acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**15.** At all times pertinent hereto, Defendant Scott Ervin ("Chief Deputy Ervin") was and is a Chief Deputy of the Fairfield County Sheriff's Office. As Chief Deputy, he was among the highest-ranking officers of the Sheriff's Office, held command authority over the Fairfield County Jail and over the deputies and corrections officers assigned to it, and was responsible, together with Defendant Lape, for the promulgation, review, implementation, enforcement, and audit of the policies, practices, customs, and training governing medical

receiving screening, well-being and safety checks, the use and time limits of the restraint chair, the deployment of chemical agents, and the summoning of medical care for and the transfer to a hospital of detainees at the Jail. Chief Deputy Ervin is sued in both his official and individual capacities. At all relevant times he acted under color of law and within the scope of his employment. Upon information and belief, and prior to September 7, 2024, Chief Deputy Ervin had actual knowledge of a persistent pattern of non-compliance at the Jail with the mandatory medical receiving-screening and observation requirements of Ohio Adm.Code 5120:1-8-09, and either authored or approved the policies pursuant to which his subordinates acted, or knowingly permitted the absence of such policies to continue. Chief Deputy Ervin was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death. Chief Deputy Ervin acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**16.** At all times pertinent hereto, Defendant Lieutenant Jeffrey Reed was/is the Jail Administrator/Commander of the Fairfield County Jail, an assistant to Defendant Lape, and a person who made and had authority to make policy decisions with regard to the Jail, including policies governing medical receiving screening, well-being checks, use of the restraint chair, and access to medical care. He is sued in both his official and individual capacities. He was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because he authored, approved, or maintained the policies

pursuant to which his subordinates acted. He acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**17.** At all times pertinent hereto, Defendant Deputy Tyler Thomson ("Thomson"), Badge FC486, radio identifier "46," body-worn camera Axon Body 3 serial X60A9939M, was at all times relevant hereto a duly appointed deputy sheriff employed by the Fairfield County Sheriff's Office. Deputy Thomson was the primary arresting officer who took Mr. Evangelista into custody on September 7, 2024, and transported him to the Fairfield County Jail. He is sued in his individual capacity. He was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Deputy Thomson acted with deliberate indifference to Decedent's obvious and serious needs for medical attention. Deputy Thomson encouraged, authorized, approved, or knowingly acquiesced to the constitutional violations that lead to Decedent's and Plaintiff's damages. To the extent Deputy Thomson's true name differs from the name pleaded here, the difference is a misnomer or misdescription of the identified primary arresting deputy, whom Plaintiff intends to and does sue, and any amendment correcting it relates back to the filing of this Complaint under Fed. R. Civ. P. 15(c)(1)(A) and (C) and Ohio Civ.R. 15(D).

**18.** Defendant Corrections Officer Robert Kunkler ("Kunkler") was at all times relevant hereto employed as a corrections officer at the Fairfield County Jail, was assigned to the 4:00 p.m. to 12:00 a.m. shift on September 7, 2024, and carried the badge designation "CO 53."

Kunkler is the individual identified as "CO53" on the Fairfield County Sheriff's Office booking record as the officer who processed Mr. Evangelista's intake at approximately 5:35 p.m. on September 7, 2024, and who assigned him to cell B164. Kunkler is sued in his individual capacity. Kunkler was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Kunkler acted with deliberate indifference to Decedent's obvious and serious need for medical attention. Kunkler encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**19.** Defendant Jane Doe Shift Supervisor ("Shift Supervisor") was at all times relevant hereto employed by the Fairfield County Sheriff's Office as a corrections officer at the Fairfield County Jail and, on September 7–8, 2024, served as the supervisor of a mandated twelve-hour shift beginning at 8:00 p.m. She had approximately two years of service with the Fairfield County Sheriff's Office and five years in law enforcement. Her name and badge number were redacted from the investigative file released to Plaintiff by the Ohio Attorney General, and her identity remains within the exclusive knowledge and control of the named Defendants; she is otherwise identified with particularity herein and is sued in her individual capacity. The Shift Supervisor was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because she was personally involved. She acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and she encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**20.** Defendant Corrections Officer Cody Factor ("Factor"), badge CO 86, was at all times relevant hereto employed as a corrections officer at the Fairfield County Jail, assigned to the 4:00 p.m. to 12:00 a.m. shift on September 7, 2024. Factor had been employed at the Jail since March 2, 2024. He is sued in his individual capacity. Factor was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Factor acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**21.** Defendant Corrections Officer Landon Talbott ("Talbott"), badge CO 32, was at all times relevant hereto employed as a corrections officer at the Fairfield County Jail, assigned to the 12:00 a.m. to 8:00 a.m. shift on September 8, 2024. Talbott had been employed by the Fairfield County Sheriff's Office for over three years and has no previous law enforcement or military experience. He is sued in his individual capacity. Talbott was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Talbott acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**22.** Defendant Corrections Officer Brock Vanhorn ("Vanhorn"), badge CO 77, was at all times relevant hereto employed as a corrections officer at the Fairfield County Jail, assigned to the 12:00 a.m. to 8:00 a.m. shift on September 8, 2024. Vanhorn had been employed by the Fairfield County Sheriff's Office for approximately one year and has no previous law

enforcement or military experience. He is sued in his individual capacity. Vanhorn was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Vanhorn acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**23.** Defendant Corporal Austin Reeves ("Reeves"), badge CO 19, was at all times relevant hereto employed by the Fairfield County Sheriff's Office as a corrections corporal at the Fairfield County Jail and served as a shift supervisor on the 8:00 a.m. to 4:00 p.m. shift on September 8, 2024. He is sued in his individual capacity. Reeves was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Reeves acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**24.** Defendant Corrections Officer Sean Brentlinger ("Brentlinger"), badge CO 49, was at all times relevant hereto employed as a corrections officer at the Fairfield County Jail, assigned to the 8:00 a.m. to 4:00 p.m. shift on September 8, 2024. He is sued in his individual capacity. Brentlinger was and is personally responsible for the unconstitutional acts and omissions committed upon Decedent that directly or indirectly contributed to Decedent's injuries and death because he was personally involved. Brentlinger acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and

encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**25.** Defendants John/Jane Doe Deputies 1-10 are individuals in addition to those named above whose identities are presently unknown to Plaintiff, despite diligent efforts having been made, but who were, at all times relevant hereto, duly appointed deputy sheriffs employed by the Fairfield County Sheriff's Office, or law enforcement officers of assisting agencies, who responded to the September 7, 2024 call regarding Mr. Evangelista, participated in his detention and transport to the Fairfield County Jail, and/or were present at the sally port or intake area when Mr. Evangelista stated that he was having a heart attack. The name, badge number, radio call sign, and cruiser number of the primary responding deputy were redacted from every entry in the incident and computer-aided dispatch records produced to Plaintiff through the Ohio Attorney General, and the Fairfield County Sheriff's Office has not produced unredacted records that would identify the remaining responding personnel. These Defendants are sued in their individual capacities. These Defendants were and are personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because they were personally involved. These Defendants acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**26.** Defendants John/Jane Doe Corrections Officers 1-10 are individuals whose identities are presently unknown to Plaintiff, but who were, at all times relevant hereto, employed as corrections officers at the Fairfield County Jail and were responsible for monitoring,

supervising, and ensuring the safety and wellbeing of Mr. Evangelista during his detention from September 7, 2024, through September 8, 2024. The names and badge numbers of certain jail personnel were redacted from the records produced to Plaintiff through the Ohio Attorney General, and the Fairfield County Sheriff's Office has not produced the restraint-chair log, use-of-force reports, shift rosters, or well-being check records that would identify them. These Defendants are sued in their individual capacities. These Defendants were and are personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to Decedent's injuries and death because they were personally involved. These Defendants acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**27.** Defendants John/Jane Doe Medical Staff 1-5 are individuals, in addition to any nurse on duty at the Jail, whose identities are presently unknown to Plaintiff, but who were, at all times relevant hereto, employed or contracted to provide medical services at the Fairfield County Jail. Defendants have not produced any medical receiving-screening record, vital-sign documentation, or medical staffing roster for the period of Mr. Evangelista's detention, and have not identified the medical personnel responsible for his care. Whether these Defendants were employed by Fairfield County or by Defendant Premier Physician Services, Inc. and/or Defendant TeamHealth, LLC is presently unknown and is pleaded in the alternative. These Defendants are sued in their individual capacities. These Defendants were and are personally responsible for the unconstitutional acts and omissions committed upon Decedent Chad Michael Evangelista that directly or indirectly contributed to

Decedent's injuries and death because they were personally involved. These Defendants acted with deliberate indifference to Decedent's obvious and serious need for medical attention, and encouraged, authorized, approved, or knowingly acquiesced in the constitutional violations that led to Decedent's and Plaintiff's damages.

**28.** At all times material, the medical and nursing care furnished to detainees at the Fairfield County Jail was provided by personnel employed or contracted by Defendant Premier Physician Services, Inc. and/or Defendant TeamHealth, LLC, acting within the course and scope of their employment or agency, such that those corporate Defendants are liable for their conduct under the doctrines of *respondeat superior*, actual agency, and apparent or ostensible agency. In the alternative, if any such provider was an employee of Fairfield County, that provider acted within the course and scope of his or her employment. Plaintiff does not assert respondeat superior as a basis for liability against Fairfield County under 42 U.S.C. § 1983, and asserts it against Fairfield County under state law only to the extent permitted by Ohio Rev. Code Chapter 2744.

**29.** At all times material, Defendant Premier Physician Services, Inc. and/or Defendant TeamHealth employed and/or contracted with the physicians, nurses, and other medical care providers who were responsible for providing medical care to detainees at the Fairfield County Jail, including Decedent. Those providers acted within the course and scope of their employment and/or agency, such that Premier and TeamHealth are liable for their conduct under the doctrines of respondeat superior, actual agency, and apparent or ostensible agency. In the alternative, if any such provider was employed by Fairfield County, the County is liable for that provider's conduct to the extent permitted by law.

**30.** Defendant Premier Physician Services, Inc. ("Premier") is, upon information and belief, the Ohio corporation that contracted with Fairfield County to provide medical and nursing services to inmates at the Fairfield County Jail at all times relevant hereto. The Fairfield County Board of Commissioners approved a one-year extension of the contract for medical services at the Jail with "TEAMHEALTH/Premier Physicians Services, Inc." by Resolution 2024-05.28.z, adopted May 28, 2024, and approved a further one-year extension by Resolution 2025-03.25.pp, adopted March 25, 2025. Defendant TeamHealth, LLC ("TeamHealth") is, upon information and belief, a parent or affiliated entity of Premier that established, approved, or controlled the corporate policies, staffing models, and protocols under which Premier delivered health care at the Jail. Defendants have refused to produce the operative medical-services contract despite lawful public records requests, and the precise corporate arrangement remains peculiarly within Defendants' knowledge; Plaintiff will amend to conform the corporate defendants' identities to the contract upon its production. To the extent the correct legal name of either corporate Defendant differs from the name pleaded here, that difference is a misnomer or misdescription of a party whose identity Plaintiff intends to and does sue, and any amendment correcting it relates back to the filing of this Complaint under Fed. R. Civ. P. 15(c)(1)(C). As private corporations performing a traditional state function, Premier and TeamHealth are subject to suit under 42 U.S.C. § 1983, and their policies, customs, and practices governing jail medical care are evaluated under the framework of Monell v. Department of Social Services, 436 U.S. 658 (1978). Each is sued in its corporate capacity.

**31.** At all relevant times, each individual Defendant was acting under color of state law within the meaning of 42 U.S.C. § 1983.

**32.** At all times material, the County and all Defendants listed herein deprived Decedent of constitutional rights and they are responsible because the deprivation stemmed from official policies and customs such that they are liable pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**33.** Plaintiff avers that despite diligent effort, including the public records requests described below, the names of the John/Jane Doe Defendants listed above could not be discovered before the filing of this Complaint, and that their identities remain within the exclusive knowledge and control of the named Defendants. Plaintiff requests that summonses be issued for each such Defendant bearing the designation "name unknown," and pleads that any amendment substituting a true name for a fictitious designation relates back to the filing of this Complaint under Fed. R. Civ. P. 15(c)(1)(A), Ohio Civ.R. 3(A), and Ohio Civ.R. 15(D), and in the alternative under Fed. R. Civ. P. 15(c)(1)(C).

**34.** The County and all Defendants listed herein knew of clear and persistent pattern of violations of rights at the Jail, they had notice of said violations, and the approved and/or tacitly approved amounting to an official policy of inaction. Moreover, this was the moving force or direct causal link in the constitutional deprivation.

**35.** Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed were responsible for the administration, operation, and supervision of the Fairfield County Jail and its facilities, and for the promulgation, enforcement, and review of the rules, regulations, policies, training, customs, and practices relevant thereto, and each was at all relevant times acting under color of law.

**36.** Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed operated, maintained, and/or controlled the Fairfield County Jail, where Decedent

was held from approximately 4:54 p.m. on September 7, 2024 until his emergency medical transport from the Jail at approximately 10:48 a.m. on September 8, 2024, during which time Decedent was under the exclusive custody, control, and care of said Defendants and of the employees and agents of said Defendants.

**37.** The individual Defendants named herein had direct contact with Decedent and knew, or in the exercise of reasonable care should have known, of his serious medical condition, but, acting under color of state law, acted with deliberate indifference to that serious medical condition and to Decedent's constitutional rights. The policies, procedures, customs, and failures of training adopted and/or promulgated under color of state law likewise reflected deliberate indifference.

**38.** At all times material, Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed were under a non-delegable duty to ensure that detainees at the Jail were not unreasonably denied medical treatment in violation of their constitutional rights and were not otherwise deprived of their constitutional rights.

**39.** At all times material, Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed were under a non-delegable duty to promulgate policies, practices, procedures, and customs, and to train employees, to ensure that detainees at the Jail were not unreasonably denied medical treatment in violation of their constitutional rights.

**40.** At all times material, Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed were under a non-delegable duty to promulgate policies, practices, procedures, and customs, and to train employees, to ensure that detainees at the Jail were provided with adequate, necessary, and reasonable medical and mental health

care, screening, assessment, treatment, intervention, referral, and attention. They failed to do so, and that failure caused Decedent's injuries and death.

**41.** At all times material, Fairfield County, Defendant Lape, Defendant Collins, Defendant Ervin, and Defendant Reed were under a non-delegable duty to provide adequate, necessary, and reasonable medical and mental health care, screening, assessment, treatment, intervention, referral, and attention to those detained at the Jail. They failed to do so, and that failure caused Decedent's injuries and death.

**42.** At all times material, any nurse or medical staff member tasked with caring for Decedent was, under color of law, directly responsible for Decedent's custody, supervision, and care at the Jail. Each had direct contact with Decedent and knew or should have known of his serious medical condition but acted with deliberate indifference to it.

**43.** At all times material, Defendants Thomson, Kunkler, Factor, Talbott, Vanhorn, Reeves, Brentlinger, the Jane Doe Shift Supervisor, and the John/Jane Doe Corrections Officers were deputies, corrections officers, and staff tasked with guarding and caring for Decedent and were, under color of law, directly responsible for Decedent's custody, supervision, and care at the Jail. Each had direct contact with Decedent and knew or should have known of his serious medical condition but acted with deliberate indifference to it.

**44.** All Defendants caused and are responsible for the unlawful conduct and resulting harm by, inter alia, personally participating in the conduct, or acting jointly and in concert with others who did; by authorizing, acquiescing in, or failing or refusing, with deliberate indifference to and reckless disregard for Decedent Chad Michael Evangelista's clearly established and known rights, to initiate and maintain adequate training, supervision, and staffing; by failing to maintain proper and adequate policies, procedures, protocols,

customs, and practices; and by ratifying the unlawful conduct performed by the agents, officers, deputies, medical providers, personnel, and employees under their direction, supervision, and control.

**45.** At all times material, the medical care and services provided to Decedent that are the subject of this Complaint were understood by Decedent and his family to be provided by Defendants, and took place at a facility owned and/or operated by Defendants. Defendants held out the care as their own and not as care provided by independent contractors. To the extent medical care and services were provided by an individual not named as a Defendant, and that care fell below the applicable standard of care, and there was no indication to Decedent or his family to the contrary, that care and those services were provided by Defendants through their actual or apparent agents.

**JURISDICTION AND VENUE**

**46.** This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

**47.** This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts as the federal claims. All conditions precedent to this action have been satisfied or excused. To the extent any Defendant asserts the exhaustion requirement of 42 U.S.C. § 1997e(a), that requirement does not apply to this action, which is brought by the Administrator of Decedent's estate and not by a prisoner confined in a correctional facility. In the alternative, exhaustion was excused: Mr. Evangelista never regained consciousness after his collapse and died two days later, so it was impossible for him or for Plaintiff to initiate, much less exhaust, any

administrative remedy available at the Jail. Upon information and belief, Mr. Evangelista was never furnished the Jail's inmate handbook, grievance policy, or medical-request procedure at any point during his detention.

**48.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in Ohio and a substantial part of the events giving rise to Plaintiff's claims occurred in Fairfield County, Ohio, which is located within the Southern District of Ohio, Eastern Division.

**DEFENDANTS' FAILURE TO PRODUCE RECORDS AND PRE-SUIT CONCEALMENT**

**49.** Since Mr. Evangelista's death on September 9, 2024, Plaintiff has made multiple formal public records requests pursuant to Ohio's Public Records Act, Ohio Revised Code § 149.43, seeking documents necessary to understand the circumstances of Mr. Evangelista's death and to identify the individuals responsible for his care. Defendants have refused to produce critical records.

**50.** Despite receiving Plaintiff’s multiple formal public records requests, Defendants have never produced: (a) the medical intake screening form, if any, completed upon Mr. Evangelista's booking; (b) safety check or cell check logs documenting observations of Mr. Evangelista, if any, during his seventeen-hour detention; (c) the identities of the primary arresting deputy, the female jail shift supervisor, and the medical staff responsible for Mr. Evangelista's care (the identities of most, but not all, of the corrections officers involved became known to Plaintiff only through the Ohio Attorney General’s release of the closed investigative file); or (d) the medical services contract identifying the corporate medical provider.

## STATEMENT OF FACTS

***The 911 Call and Police Response***

**51.** At approximately 3:54 p.m. on September 7, 2024, a civilian called 911 to report a man walking in and out of the roadway near the Aldi at 720 West Waterloo Street, Canal Winchester. The caller reported an agitated male who kept going in and out of the roadway and that he “did not seem right or normal.” The caller reported that she had watched him for several minutes and that he would walk a few steps, stop, turn, walk a few more steps, and repeat. The call was marked ready for dispatch at approximately 3:56 p.m. and Deputy Thomson was assigned as the primary unit at approximately 3:57 p.m.

**52.** Four law enforcement agencies had personnel involved in the events that followed. From the Fairfield County Sheriff's Office: Defendant Deputy Tyler Thomson, the primary and arresting deputy; Deputy Luca Renner (Unit 529); and Deputy Benjamin Roderick (Unit 530). From the Franklin County Sheriff's Office: Deputy Richard Verhoeven, who was working special duty nearby, together with additional Franklin County units that Franklin County dispatched on its own initiative. From the Lithopolis Police Department: Chief Wesley Barton (Unit LITH1) and Officer Kurtis Schmidt (Unit LITH8). From the Madison Township Police Department: units identified in dispatch records as MTPD 13 and MTPD 15, requested through Franklin County dispatch at Fairfield County's request.

**53.** Upon arrival, Deputy Thomson observed Mr. Evangelista walking in and out of the roadway, yelling for his mother. Deputy Thomson described Mr. Evangelista's behavior as that of someone "experiencing the effects of being on drugs, such as methamphetamine or another stimulant," and stated that Mr. Evangelista was "sweating profusely, had pinpoint pupils and had no focus."

**54.** While Deputy Thomson was attempting to speak with him, Mr. Evangelista called 911 himself. Two 911 calls were transferred to Fairfield County from the Franklin County dispatch center. On those recordings Mr. Evangelista is heard screaming "Help!," "Help me!," "Someone help me!," "Ahhh!," and "Mom!" repeatedly. Asked for his location, he said "I'm at the…" twice and never completed the sentence.

**55.** Deputy Thomson eventually apprehended Mr. Evangelista near the Bob Evans restaurant at Winchester Square, at approximately 4:06 p.m. Deputy Thomson placed Mr. Evangelista in handcuffs and, at approximately 4:11 p.m., Mr. Evangelista was secured in the back seat of Deputy Verhoeven's Franklin County cruiser, where he remained for roughly the next fifteen minutes while Deputy Thomson retrieved his equipment and repositioned his own cruiser.

**56.** Every officer who saw Mr. Evangelista and interacted with him at the scene later reported that they suspected he was under the influence of drugs. Deputy Thomson described his behavior as that of a person "experiencing the effects of being on drugs, such as methamphetamine or another stimulant," and reported that Mr. Evangelista was "sweating profusely, had pinpoint pupils and had no focus." The Ohio Bureau of Criminal Investigation summarized the accounts of all of the officers who had direct contact with Mr. Evangelista that day: each "described his behavior as someone under the influence of drugs," and all "described Evangelista as having a vacant expression, being agitated and/or paranoid, profusely sweating and constantly moving." All of them "consistently described Evangelista's speech as unintelligible and his behavior as erratic." His sweaty face, labored breathing, with exaggerated exhales, was observed and recorded on the body-worn cameras of officers from three different agencies.

**57.** At approximately 4:26 p.m., Mr. Evangelista was transferred from Deputy Verhoeven's cruiser to Deputy Thomson's cruiser for transport to the Fairfield County Jail.

**58.** The transport to the Fairfield County Jail took approximately twenty-five minutes and was recorded in its entirety by Deputy Thomson's body-worn camera. Throughout the ride, Mr. Evangelista repeatedly stated his name, his address, his mother's name, and his medical diagnoses, over and over. His statements grew louder as time went on. His speech was slurred and his sentences were incomplete. His exaggerated exhales are audible for the entire car ride. For the length of the ride, Mr. Evangelista is heard saying "please," over and over. He told Deputy Thomson repeatedly that he had a heart condition; that he was on blood thinners; that he had blood clots; that he had a heart doctor; that he had medicine and needed to take it; that he was having an emergency. He asked, again and again, to be taken to the hospital, and specifically to the emergency room. Interwoven with those pleas, he repeated his own name, his address, his mother's name, his mother's telephone number, and the names of the family members he lived with, and he begged Deputy Thomson to call his mother or someone in his family.

**59.** Deputy Thomson did not divert to a hospital, did not summon a medic, and did not relay any information pertaining to Mr. Evangelista’s condition to the Jail prior to their arrival. The only information that had been transmitted to the Jail prior to arrival was that he had been advised he was combative. No information was communicated to the Jail in advance about Mr. Evangelista's heart condition, his medications, his requests to go to a hospital or an emergency room, his statement that he thought he was having a heart attack, or the fact that Deputy Thomson himself, in a statement to another officer at the scene recorded on body-worn camera, described the call as “a mental health call.”

**60.** Deputy Thomson arrived at the Fairfield County Jail at approximately 4:54 p.m. Mr. Evangelista was still asking to go to the hospital and still repeating his personal information as the cruiser pulled into the sally port. Deputy Thomson briefed Defendant Kunkler on the details of the incident there. When Officer Kunkler opened the cruiser door and asked Mr. Evangelista questions, Mr. Evangelista spoke over Officer Kunkler, still repeating his own name and address. He told Officer Kunkler that he had not used drugs, that he had a heart condition, and what his medical diagnoses were. He was then pulled from the cruiser, and as he was escorted toward the jail door, he began yelling that he was having a heart attack and calling for help. His face was wet with sweat and foamy saliva was visible around his mouth. Inside the jail, moments later, he was heard saying that it hurt, saying his own name, and saying once more, with a labored breath, that he needed to go to the hospital.

**61.** Generally accepted law enforcement practice, including the principles taught in Crisis Intervention Team ("CIT") training, is that a field deputy is not qualified to medically clear a person who presents with altered mental status, complains of a cardiac symptom, or displays behavior consistent with stimulant intoxication or psychiatric crisis, and that such a person is to be medically cleared before booking.

**62.** Deputy Thomson instead delivered Mr. Evangelista to the Jail rather than to the hospital and told the Jail personnel only that Mr. Evangelista was combative. Deputy Thomson thereby both failed to obtain the care Mr. Evangelista's condition required and deprived the Fairfield County Jail of the information it needed to obtain that care itself.

***Booking and Incarceration***

**63.** Mr. Evangelista arrived at the Fairfield County Jail at approximately 4:54 p.m. on September 7, 2024 and was booked at approximately 5:35 p.m. The booking officer was Defendant Kunkler, badge CO 53.

**64.** Within minutes of entering the jail, Mr. Evangelista was taken to the floor of the pre-booking cell by Defendant Kunkler and two other jail personnel so that his handcuffs could be removed. He was by then visibly incoherent, speaking unintelligibly, unable to follow or respond to directions, and, according to jail personnel, apparently under the influence of drugs. Rather than treating that presentation as the medical emergency it was, the Jail treated it as a compliance problem and responded with physical control. Upon information and belief, no medical receiving screening was performed, no vital signs were taken, and no medical or mental health provider was contacted at intake, and none was contacted about his medical condition at any time before his collapse. The only emergency medical call the Jail placed before that collapse was made at approximately 10:30 p.m., and it was made to have a cut on his lip evaluated, not to have his condition assessed.

**65.** Corrections Officer Hoy, who was on duty when Mr. Evangelista was first lodged, observed that he was "irritated and not comprehending what the officers were telling [him]," heard him "screaming nonsensical things, repeating his name," and heard him say that he needed "to get out of there."

**66.** Defendant Factor, who assisted in escorting Mr. Evangelista into the facility, observed that he "appeared to be visibly intoxicated" on arrival and that he "inexplicably kept reciting his own name, his mother’s name, and his mother’s address."

**67.** Fourteen videos from ten cameras captured more than nineteen hours inside the Fairfield County Jail. From approximately 5:05 p.m. until approximately 10:18 p.m., more than five

hours, Mr. Evangelista was "constantly moving, fidgeting with his hands and talking," and "was never observed to stop moving." He tried to open the cell door at the lock. He knocked on the windows. He beat on the cell window, the cell door, and the ceiling camera with his shoe. He drank water repeatedly. He appeared to be talking directly to the ceiling camera. He did not sit down and he did not stop. He stood on the half wall. Despite Mr. Evangelista's deteriorating mental capacity over those five hours, no medical attention was summoned or rendered.

**68.** At approximately 10:18 p.m., Defendant Jane Doe Shift Supervisor entered the cell and deployed OC spray directly at Mr. Evangelista's face. It had no effect.

**69.** At approximately 10:26 p.m., following a struggle in which Defendant Kunkler took Mr. Evangelista to the ground and Defendants Kunkler, Factor, and the Shift Supervisor participated in handcuffing him, Mr. Evangelista was strapped into a restraint chair at the shoulders, waist, and ankles with his hands cuffed behind his back. While he was being secured, Shift Supervisor struck him with a closed fist on the bicep and struck his leg multiple times with a closed fist, including after he was in the chair. At approximately 10:27 p.m., with Mr. Evangelista strapped down, Mr. Evangelista was still observed to have labored breathing. By approximately 10:28 p.m. there was blood on his chin. A spit hood and mesh covering were placed over his head and face, and at approximately 10:39 p.m. he was wheeled, still in the chair, into cell B164, MALE DETOX.

**70.** At approximately 10:41 p.m., one medic entered the cell and left roughly ninety seconds later. At approximately 10:45 p.m., deputies and one medic returned; the Shift Supervisor took hold of both sides of Mr. Evangelista's chin and pulled his head back against the chair, and the group left about a minute after that. That is the entirety of the contact any medical

responder had with Mr. Evangelista during his detention. The medics obtained no vital signs at all. No provider examined him, diagnosed him, took a temperature, took a pulse, or left any instruction for his care. The medics had been summoned to evaluate the cut on Mr. Evangelista's lip, which was deemed superficial. According to jail personnel, Mr. Evangelista, hooded, strapped into the restraint chair, and calling the medics "robbers" and "ninjas."

**71.** Mr. Evangelista remained strapped in the restraint chair for approximately four hours and twenty minutes, until 2:45 a.m. on September 8, 2024. On Jail video footage, Mr. Evangelista is observed moving and talking continuously the entire time. Within two minutes of his removal from the chair, at approximately 2:47 a.m., the Shift Supervisor deployed OC spray on him. It again had no apparent effect.

**72.** Mr. Evangelista then remained alone in cell B164 for approximately seven hours and twenty-three minutes. During that period he stood on the half wall to reach the ceiling camera, bent repeatedly over the toilet, tore the t-shirt he was wearing, removed it, and splashed toilet water onto the shirt and across the cell. During and after his removal from the restraint chair, he was heard by jail staff repeatedly yelling the word "Fire!" He never stopped moving and he never stopped talking.

**73.** During this critical period, Mr. Evangelista was suffering from acute methamphetamine toxicity. Untreated, that condition produces a progressive cascade of physiological effects including hyperthermia, tachycardia, agitation, rhabdomyolysis (muscle breakdown), and metabolic acidosis, all of which progress to organ failure, cardiac arrest, and death.

**74.** Methamphetamine toxicity produces visible, observable symptoms including profuse sweating, agitation, confusion, rapid breathing ("air hunger"), and progressive lethargy.

These symptoms were or should have been apparent to the corrections officer or medical staff member conducting routine safety checks.

**75.** Upon information and belief, the Fairfield County Jail maintains a written policy requiring that personal observation checks on inmates be performed every sixty minutes. Those checks were not performed on Mr. Evangelista at the required frequency during his detention, and to the extent any check was performed, the observations of his deteriorating condition were neither documented nor acted upon. Defendants have produced no well-being check log, observation record, restraint-chair log, or medical observation record of any kind for Mr. Evangelista's detention.

**76.** Mr. Evangelista manifested clear, undeniable, and objectively obvious signs of physiological distress during his arrest and throughout the intake and detention process. His excessive sweating, extreme agitation, altered mental status and explicit pleas for medical attention presented an objectively serious medical emergency requiring immediate cardiovascular and toxicological intervention. Dismissing fatal overdose symptoms as mere behavioral non-compliance or routine intoxication constitutes deliberate indifference. *Grote v. Kenton Cty*., 85 F.4th 397, 406 (6th Cir.2023).

***The Cardiac Arrest and Emergency Response***

**77.** At 10:10:22 a.m. on September 8, 2024, Mr. Evangelista collapsed on the floor of his cell, alone. His body was still moving after he fell. Jail staff, including Defendant Reeves and Defendant Brentlinger, entered beginning at 10:11:19 a.m. and performed a sternum rub and checked his eyes with a light. The jail nurse did not enter until 10:15:13 a.m. Naloxone was administered at 10:15:59 a.m., and the first chest compression was delivered at 10:16:27 a.m., six minutes and five seconds after Mr. Evangelista went down. No

automated external defibrillator was ever deployed, and naloxone was administered before any chest compression was attempted. Medics did not reach the cell until 10:21:36 a.m., and at 10:22:03 a.m. a medic dragged Mr. Evangelista out of the cell by his ankles. Upon information and belief, no nurse, physician, or other medical professional had performed any assessment of Mr. Evangelista at any time during the preceding seventeen hours.

**78.** Mr. Evangelista suffered a cardiac arrest inside the Fairfield County Jail. The Lancaster Fire Department patient care record documents a primary impression of cardiac arrest and a secondary impression of respiratory arrest, records the arrest as having occurred "Prior to EMS Arrival," identifies the presumed etiology as cardiac, and records the initial cardiac rhythm as asystole.

**79.** The failure to obtain medical care for Mr. Evangelista was not the lapse of a single officer on a single shift. It was continuous across three consecutive shifts and was expressly handed from one shift to the next. The Jane Doe Shift Supervisor briefed the incoming 8:00 a.m. shift that Mr. Evangelista was still displaying the behavior of a person under the influence of drugs. Defendant Reeves received that briefing and has admitted he was told Mr. Evangelista "was under the influence of drugs based on the behavior Evangelista displayed since he was brought in." Defendant Brentlinger was likewise notified by outgoing personnel of Mr. Evangelista’s condition and behavior. Yet Officer Keys, who was on the same shift and who performed chest compressions on Mr. Evangelista roughly two hours later, has stated that he was given no information about Mr. Evangelista at all. Every officer who received the handoff understood that Mr. Evangelista had been visibly intoxicated and behaviorally abnormal for fifteen straight hours, and not one of them sought medical care for him.

**80.** Emergency Medical Services from the Lancaster Fire Department arrived at the jail at approximately 10:19 a.m. Upon arrival, EMS personnel found Mr. Evangelista in asystole (flatline cardiac rhythm) with a Glasgow Coma Scale score of 3 (indicating deep coma), pale, and unresponsive.

**81.** EMS personnel administered multiple rounds of epinephrine, defibrillation, and other advanced cardiac life support interventions. Return of spontaneous circulation (ROSC) was achieved in the field following defibrillation. Mr. Evangelista lost pulses again at approximately 10:54 a.m. after he was moved to the ambulance, and circulation was restored a second time before his arrival at the hospital.

**82.** Mr. Evangelista's initial point-of-care blood glucose reading was critically low at 33 mg/dL, requiring administration of dextrose (D10).

**83.** Mr. Evangelista was transported emergently to Fairfield Medical Center, arriving at approximately 11:02 a.m.

***Hospital Findings Confirm Medical Emergency at Time of Arrest***

**84.** Upon arrival at Fairfield Medical Center, Mr. Evangelista's laboratory values and clinical findings demonstrated that he had been suffering from a severe, life-threatening medical emergency:

a. pH of 6.71 (normal 7.35-7.45) indicating severe metabolic acidosis of a degree described in the medical literature as incompatible with life;

b. Potassium of 7.7 mEq/L (normal 3.5-5.1) indicating critical hyperkalemia causing lethal cardiac arrhythmias;

c. High-sensitivity Troponin-I of 111 ng/L, rising to 122 ng/L (reference range 0-78 ng/L) indicating active cardiac muscle damage (myocardial injury);

d. Creatinine of 6.97 mg/dL (normal 0.7-1.3) indicating acute kidney failure;

e. Laboratory blood glucose of 52 mg/dL (normal 74-106), after an initial point-of-care reading of 33 mg/dL indicating critical hypoglycemia;

f. Temperature of 91.4°F (normal 98.6°F) indicating severe hypothermia following cardiovascular collapse. In addition, Mr. Evangelista's ammonia level was 197 (critical) and his estimated glomerular filtration rate was 9, reflecting profound metabolic collapse and renal failure.

**85.** These laboratory findings confirm that Mr. Evangelista's complaint to officers that he was having a heart attack was consistent with genuine, objectively verifiable cardiac injury: his heart muscle was in fact being damaged (elevated and rising troponin), and he was experiencing progressive physiological decompensation.

**86.** The behaviors that officers characterized as "resisting," "combative," and "fleeing" were, in fact, symptoms of his medical emergency, that is, the agitation, confusion, and fight-or-flight response caused by metabolic acidosis, hypoxia, and stimulant toxicity.

***Death and Cause of Death***

**87.** Due to the severity of his condition, Mr. Evangelista was transferred by ambulance to Riverside Methodist Hospital in Columbus, Ohio in critical condition.

**88.** In spite of extensive life-saving measures, it was determined that Chad Michael Evangelista had suffered profound and irreversible brain damage and multi-system organ damage that led directly to his death on September 9, 2024, at 5:20 p.m. at Riverside Methodist Hospital. A CT scan of Mr. Evangelista's brain at Fairfield Medical Center on September 8 had already shown diffuse effacement of gray-white differentiation which is the radiographic signature of severe anoxic brain injury.

**89.** The Franklin County Coroner determined the cause of death to be "Complications of acute methamphetamine/amphetamine toxicity."

**90.** Methamphetamine toxicity is a treatable condition when properly diagnosed and managed. Standard medical treatment, to include sedation, IV fluids, cooling measures, and monitoring, would, to a reasonable degree of medical probability and as expert testimony will establish, have prevented the progression to rhabdomyolysis, renal failure, hyperkalemia, and cardiac arrest that caused Mr. Evangelista's death.

***Defendants' Knowledge and Deliberate Indifference***

**91.** Mr. Evangelista was at all relevant times a pretrial detainee and arrestee. Each individual Defendant is liable if he or she acted deliberately, and recklessly, in the face of an unjustifiably high risk to Mr. Evangelista's health that was either known to that Defendant or so obvious that it should have been known. Here the risk was both known and obvious, and it was obvious for seventeen consecutive hours.

**92.** From the first minutes of the encounter, every officer who saw Mr. Evangelista concluded that he was under the influence of drugs. The Ohio Bureau of Criminal Investigation, after interviewing fourteen law enforcement witnesses, found that all of those who had direct contact with Mr. Evangelista "described his behavior as someone under the influence of drugs and no odor of alcohol emitting from his breath," that all "described Evangelista as having a vacant expression, being agitated and/or paranoid, profusely sweating and constantly moving," and that all "consistently described Evangelista's speech as unintelligible and his behavior as erratic." Defendants' own contemporaneous assessment was therefore that they were dealing with an acute stimulant intoxication. Symptoms of drug intoxication and overdose are recognized as sufficiently serious and obvious that a

layman, including a deputy or a corrections officer with no medical training, is charged with appreciating them. See *Grote v. Kenton County*, 85 F.4th 397, 406 (6th Cir. 2023).

**93.** In addition to their shared conclusion that Mr. Evangelista was acutely intoxicated, Defendants observed all of the following, and each observation is recorded in materials Defendants themselves generated:

a. The reporting civilian's account, entered into the dispatch record before any officer arrived, that Mr. Evangelista seemed agitated, kept walking in and out of the roadway, and that he “did not seem right or normal” and that he would walk a few steps, stop, turn, walk a few more steps, and repeat;

b. His profuse sweating, pinpoint pupils, absence of focus, and vacant or "1000-yard" stare, observed by the Deputy Thomson at the roadside and by the jail shift supervisor five and a half hours later;

c. His labored breathing with exaggerated exhales, captured on the body-worn cameras of three separate agencies at the scene, audible for the entire twenty-five-minute transport, and still documented at 10:27 p.m. while he was strapped into a restraint chair;

d. His slurred speech, his inability to complete a sentence, his inability to answer direct questions, and his perseverative repetition of his own name, address, mother's name and telephone number, and medical diagnoses, growing louder over time;

e. His own repeated statements, made to Deputy Thomson and Defendant Kunkler, that he had a heart condition, that he needed to go to the hospital, and that he was having a heart attack;

f. His inability, over more than five hours in the pre-booking cell, to stop moving, stop talking, sit down, or follow a direction;

g. His failure to react to repeated direct facial deployments of OC spray, which every jail witness confirmed had no effect;

h. His continued, uninterrupted movement and speech while strapped by the shoulders, waist, and ankles into a restraint chair for four hours and twenty minutes;

i. His conduct during the final approximately seven hours and twenty-three minutes in cell B164, standing on the half wall to reach the ceiling camera, tearing off and removing his own shirt, splashing toilet water onto the shirt and across the cell, repeatedly yelling the word "Fire!," and never once stopping, until he collapsed on the floor.

**94.** Defendants consciously disregarded Mr. Evangelista's obvious need for serious medical care. In the field, they responded to a man in medical crisis by taking him into custody rather than to a hospital; by declining to summon a medic; by advising the Jail in advance that he was combative and advising it of nothing else; and by transmitting to dispatch, mid-transport, a statement Mr. Evangelista made about a warrant while transmitting nothing about his heart.

**95.** At the Jail, they responded to the same presentation with control rather than care: by taking him to the floor at intake instead of assessing him; by spraying him with a chemical irritant twice; by strapping him into a restraint chair for more than four hours; by striking him while he was restrained; by placing a spit hood over the face of a man who was visibly struggling to breathe; and, for the seventeen hours between his arrival and his collapse, by

treating a medical emergency as a custody problem. At no point did any Defendant contact a physician, order an evaluation, or transfer him to a hospital.

**96.** In seventeen hours, no Defendant performed the written medical receiving screening Ohio law required. No Defendant took a pulse, a blood pressure, a respiratory rate, or an oxygen saturation. No Defendant ever took his temperature. No Defendant obtained a blood sugar. No Defendant asked what medications he took, notwithstanding that he had volunteered his diagnoses to at least two of them. No Defendant documented a single medical observation of any kind. Any one of these steps would have begun to reveal what was happening inside him. When Mr. Evangelista finally reached a hospital, within approximately one hour of his cardiac arrest, his arterial pH was 6.71, his potassium was 7.7, his creatinine was 6.97, and his point-of-care blood glucose was 33, values that do not develop in an hour, and that were developing, undetected and unlooked-for, throughout the seventeen hours he spent in Defendants' custody.

**97.** Ohio Adm.Code 5120:1-8-09(C) required that a written medical, dental, substance abuse and mental health receiving screening be performed on Mr. Evangelista by health trained personnel within six hours of his arrival at the Fairfield County Jail. Mr. Evangelista arrived at the Jail at approximately 4:54 p.m. on September 7, 2024. The six-hour deadline therefore expired at approximately 10:54 p.m. that evening. By that time Mr. Evangelista had been sprayed in the face with a chemical agent that had no effect on him, taken to the floor, struck with closed fists, strapped by the shoulders, waist, and ankles into a restraint chair, hooded, and wheeled into a detox cell, and no screening of any kind had been performed. He remained in the Jail for more than eleven additional hours after the deadline passed. The screening the rule required is one that expressly includes a substance abuse

component, and Mr. Evangelista was a man whom every Defendant who encountered him believed to be acutely intoxicated.

## CLAIMS FOR RELIEF

## COUNT I

### 42 U.S.C. § 1983 – Fourteenth Amendment Deliberate Indifference

(Against Deputy Thomson, Officer Kunkler, Officer Factor, Officer Talbott, Officer Vanhorn, Corporal Reeves, Officer Brentlinger, Jane Doe Shift Supervisor, John/Jane Doe Deputies 1-10, John/Jane Doe Corrections Officers 1-10, and John/Jane Doe Medical Staff 1-5, each in their individual capacities)

**98.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**99.** At all relevant times, Mr. Evangelista was either an arrestee or a pretrial detainee. His rights to adequate medical care are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**100.** Mr. Evangelista had a serious medical need: acute methamphetamine toxicity causing rhabdomyolysis, metabolic acidosis, hyperkalemia, and progressive organ failure. This condition was objectively serious, life-threatening, and required immediate medical treatment.

**101.** Mr. Evangelista was never medically cleared at intake. He requested medical attention repeatedly and stated that he was having a heart attack. No Defendant ever summoned a medical assessment of his intoxication or of his cardiac complaints. Mr. Evangelista lacked the capacity to refuse care, and no Defendant took any step to obtain the assessment his condition obviously required. There was no penological justification for withholding medical assessment from him: he required no separate confinement and no special security measures beyond those already in place.

**102.** Defendant Thomson and John/Jane Doe Deputies 1-10 took Mr. Evangelista into custody while he was visibly and audibly in medical distress, transported him to a jail rather than to an emergency department, and caused the Jail to be advised only that he was "combative" while omitting his medical presentation entirely. An officer who learns that a person in his custody needs medical attention and neither obtains that attention nor conveys the information to those who take custody next is deliberately indifferent. *See e.g., Batton v. Sandusky Cty.*, 6th Cir. No. 23-3168, 2024 U.S. App. LEXIS 8330, at *13 (Apr. 5, 2024). The government may discharge that obligation by taking an arrestee to a hospital rather than to a jail. *Id.* Mr. Evangelista was instead diverted away from a hospital and then left without any medical assessment for more than seventeen hours, until he suffered a fatal cardiac arrest.

**103.** Because Mr. Evangelista was a pretrial detainee and arrestee rather than a convicted prisoner, Plaintiff need not establish that any Defendant subjectively appreciated the risk. It is sufficient that each Defendant acted deliberately, and recklessly, in the face of an unjustifiably high risk of harm that was either known to that Defendant or so obvious that it should have been known. *See Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023); *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310-11 (6th Cir. 2023). Symptoms of drug intoxication and overdose are sufficiently serious and obvious that a layperson is charged with appreciating them. *Grote v. Kenton County*, 85 F.4th 397, 406 (6th Cir. 2023).

**104.** Here both standards are satisfied. Defendants had actual knowledge of Mr. Evangelista's medical distress: he told them he had a heart condition, asked repeatedly to be taken to a hospital, and said he was having a heart attack; every officer who had direct contact with him concluded he was under the influence of drugs; and the outgoing jail shift expressly

briefed the incoming shift that he was still behaving as a person under the influence of drugs two hours before he collapsed. In the alternative, even if no Defendant subjectively appreciated the physiological mechanism of acute stimulant toxicity, the outward manifestations of his decompensation were so objectively obvious that any reasonable officer or correctional health professional would have recognized the unjustifiably high risk of harm.

**105.** The deference ordinarily afforded to non-medical jail staff who rely on the judgment of a medical professional has no application here. *See Greene v. Crawford Cty.*, 22 F.4th 593 (6th Cir.2022). No medical professional ever evaluated Mr. Evangelista. The single medical contact of record, a medic who was in his cell for approximately ninety seconds at 10:41 p.m. on September 7, 2024, produced no vital signs, no blood sugar, no examination, no diagnosis, and no instruction for his care, and was followed by more than eleven hours of new and escalating symptoms that no provider observed. Upon information and belief, the medics were never informed of Mr. Evangelista's cardiac complaints and were never asked to evaluate his intoxication. There was accordingly no medical judgment on which any Defendant could have relied, and no instruction that any Defendant implemented.

**106.** The actions and omissions of the individual Defendants were objectively unreasonable and constituted deliberate indifference to Mr. Evangelista's serious medical needs in violation of the Fourteenth Amendment. As to each Defendant:

a. Deputy Thomson personally observed Mr. Evangelista's labored breathing, erratic behavior, altered mental status and that Mr. Evangelista was profusely sweating. Deputy Thomson personally heard Mr. Evangelista's cardiac complaints and pleas to be transported to a hospital. Deputy Thomson instead transported Mr. Evangelista to

the jail rather than to an emergency department and advised jail staff only that he was "combative";

b. Officer Kunkler received Mr. Evangelista at the sally port, heard him state that he had a heart condition, that he needed to go to the hospital, and that he was having a heart attack. Officer Kunkler then processed Mr. Evangelista's intake and placed him in a cell without performing or arranging the receiving screening that Ohio law required and without any medical assessment;

c. Officer Factor assisted in escorting Mr. Evangelista into the facility while observing that he "appeared to be visibly intoxicated," observed him reciting his own name and his mother's name and address over and over, and failed to arrange for any medical assessment;

d. The Jane Doe Shift Supervisor observed at the outset of her shift that Mr. Evangelista was agitated, profusely sweating, and had a "1000-yard stare" indicative of drug intoxication, deployed OC spray at his face on two separate occasions with no effect, struck him with closed fists including after he was restrained, ordered him placed in a restraint chair and removed him from it only because, as she later told investigators, she knew the policy "time limit" was near, and at the end of her shift briefed the oncoming shift that he was still displaying the behavior of a person under the influence of drugs, all without ever summoning a physician, obtaining vital signs, or arranging his transfer to a hospital;

e. Officers Talbott and Vanhorn observed Mr. Evangelista in the early morning hours of September 8, 2024 behaving as though he was "high on drugs," exhibiting

extraordinary strength, and repeatedly yelling the word "Fire!," and used physical force to confine him to his cell rather than obtaining medical care;

f. Corporal Reeves and Officer Brentlinger received the outgoing shift's briefing regarding Mr. Evangelista's condition, observed him during the final hours of his detention saying nonsensical words and playing with toilet water while appearing to be under the influence of drugs, and did not summon medical care at any time before his collapse;

g. The John/Jane Doe Corrections Officers were assigned to monitor Mr. Evangelista during the seventeen-hour gap and either failed to perform the required checks or failed to act on what those checks revealed; and

h. The John/Jane Doe Medical Staff were on duty and responsible for receiving screening and medical response yet never assessed Mr. Evangelista before his collapse.

**107.** As a direct and proximate result of the Defendants' deliberate indifference, Mr. Evangelista suffered extreme physical pain and suffering, was denied life-saving medical treatment, and died.

## ALLEGATIONS APPLICABLE TO MUNICIPAL AND CORPORATE LIABILITY COUNTS

**108.** Because the Defendants have maintained exclusive custody and control over the Fairfield County Jail's internal policy manuals, medical contractor protocols, surveillance footage, safety-check logs, and training materials, and have persistently refused to produce them despite nearly two years of lawful public records requests, the specific contours of the County's, Premier's, and TeamHealth's unconstitutional customs and policies are pleaded upon information and belief. Plaintiff is entitled to this pleading standard because the

foundational facts regarding the jail's internal operations remain peculiarly within the possession and control of the Defendants.

## COUNT II

### 42 U.S.C. § 1983 – Monell Claim for Unconstitutional Policy, Practice, or Custom

(Against Fairfield County and against Sheriff Lape, Chief Deputy Collins, Chief Deputy Ervin, and Lieutenant Reed in their official capacities)

**109.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**110.** Defendant Fairfield County, acting through its Sheriff and the operations of the Fairfield County Jail, maintained and implemented policies, practices, and customs that were the moving force behind the constitutional violations that caused Mr. Evangelista's death.

**111.** Upon information and belief, these policies, practices, and customs include but are not limited to:

a. A policy, practice, or custom of booking individuals into the jail without first obtaining medical clearance when they exhibit signs of altered mental status, drug intoxication, or acute medical distress;

b. A policy, practice, or custom of inadequate medical intake screening at the jail;

c. A policy, practice, or custom of inadequate training of deputies and corrections officers on recognizing and responding to medical emergencies;

d. A policy, practice, or custom of inadequate medical monitoring of inmates;

e. A policy, practice, or custom of treating medical emergencies as behavioral problems;

f. A failure to train deputies on Crisis Intervention Team (CIT) protocols;

g. A failure to adequately staff the jail with qualified medical personnel;

h. A policy, practice, or custom of vesting corrections officers with no medical training, including officers with no prior law enforcement or military experience whatsoever,

with unreviewable discretion to determine whether a detainee required medical attention during the hours when no nurse or physician was on site;

i. A policy, practice, or custom of failing to comply with Ohio Adm.Code 5120:1-8-09(C), which requires that "[h]ealth trained personnel, in accordance with protocols established by the health authority, will perform a written medical, dental, substance abuse and mental health receiving screening on each inmate within six hours of arrival at the jail," and with Ohio Adm.Code 5120:1-8-09(A), which requires that "[t]he jail has a designated health authority with responsibility for health and/or mental health care services pursuant a written agreement, contract or job description," resulting in the systemic incarceration of individuals experiencing acute medical emergencies without any screening or medical evaluation;

j. A failure to supervise and discipline deputies and corrections officers who fail to provide adequate medical care to inmates;

k. A policy, practice, or custom of routinely ignoring or systematically violating the mandatory medical receiving-screening requirements set forth in Ohio Administrative Code 5120:1-8-09, thereby demonstrating a deliberate indifference to the serious medical needs of incoming arrestees;

l. A policy, practice, or custom of failing to comply with the mandatory written medical receiving screening required "upon arrival at the jail and prior to being placed in general population," and the twenty-four-hour emergency medical, dental, and mental health care services mandated by Ohio Adm.Code 5120:1-8-09(E), resulting in the systemic incarceration of individuals experiencing acute medical emergencies.

m. A policy, practice, or custom of failing to establish or follow criteria for the immediate transfer of inmates experiencing severe, life-threatening intoxication to a hospital, as Ohio Adm.Code 5120:1-8-09(W) requires.

n. A policy, practice, or custom of vesting non-medical corrections officers with unreviewable discretion to determine whether an arrestee required medical assessment, without any provision requiring consultation with a licensed medical provider and without any criteria governing when such consultation must occur;

o. The absence of any written policy or protocol governing the treatment and observation of arrestees manifesting symptoms of acute stimulant intoxication, and the absence of any established criteria triggering transfer of such an arrestee to a hospital;

p. The absence of any written policy governing the frequency, content, or documentation of well-being observations of arrestees housed in a booking, intake, or holding cell.

**112.** In the alternative, the constitutional violations alleged herein arose from an obvious need for training and policy, that is, the need to recognize and respond to chest pain complaints, altered mental status, and acute intoxication in arrestees, such that the County's failure to provide such training and policy reflects deliberate indifference. See *Winkler v. Madison Cty.*, 893 F.3d 877 (6th Cir.2018); *Helphenstine v. Lewis Cty.*, 60 F.4th 305 (6th Cir.2023). Specifically:

a. the training the County provided was inadequate for the tasks its deputies and corrections officers actually performed, in that they were required to determine what constituted a medical emergency without training in recognizing altered mental status, acute stimulant toxicity, or complaints of cardiac symptoms, and without training in

the mandatory receiving-screening and transfer criteria of Ohio Admin. Code 5120:1-8-09;

b. that inadequacy resulted from the County's deliberate indifference, because the need for such training in a facility that routinely receives acutely intoxicated arrestees is patently obvious; and

c. that inadequacy was closely related to and actually caused Mr. Evangelista's death.

**113.** Upon information and belief, the County's contracted medical provider furnished on-site medical coverage at the Jail for only a limited portion of each day, with the consequence that the County left untrained corrections officers to determine for themselves what constituted a medical emergency. Further, and independently, the County is liable qua municipality for the constitutional violation resulting from its own policies and customs, without regard to whether any individual employee is ultimately shown to have violated the Constitution. *Grote v. Kenton County*, 85 F.4th 397, 414 (6th Cir. 2023).

**114.** In the alternative that the County maintained a custom of tolerance of and acquiescence in such departures, and that its written policies were not enforced, audited, or followed in practice. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The duty to provide constitutionally adequate medical care to persons in the custody of the Fairfield County Jail, to promulgate and enforce policies ensuring that care, and to train and supervise the personnel who deliver it, is non-delegable. Fairfield County and Sheriff Lape did not discharge that duty by contracting with Premier Physician Services, Inc. and/or TeamHealth. Upon information and belief, the operative contract did not delegate to Premier and/or TeamHealth final authority over all of the County's medical policy

decisions, and the County retained responsibility for medical receiving screening and for the observation of inmates housed in its Jail.

**115.** These policies, practices, and customs were the moving force behind the constitutional violations that caused Mr. Evangelista's death. The County's failure to train and supervise its deputies and corrections officers in the recognition of and response to medical emergencies, drug toxicity, and altered mental status, and its failure to discipline those who deny inmates medical care, are independent bases for municipal liability.

**COUNT III**

**42 U.S.C. § 1983 – Monell Claim Against Corporate Medical Provider**

(Against Premier Physician Services, Inc. and TeamHealth, LLC)

**116.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**117.** Premier, as the corporate entity contracted to provide medical services to inmates at the Fairfield County Jail, and TeamHealth, to the extent it established or controlled the policies under which Premier operated, are state actors for purposes of 42 U.S.C. § 1983 and are subject to corporate liability under the framework of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

**118.** Upon information and belief, Premier and TeamHealth maintained and implemented corporate policies, customs, and practices that were the moving force behind the constitutional violations and the deliberate indifference to Mr. Evangelista's serious medical needs that caused Mr. Evangelista's death, including but not limited to:

a. A corporate staffing policy that provided no on-site nursing coverage at the Fairfield County Jail during the overnight hours, and physician coverage of only a few hours per week, notwithstanding that the Jail books detainees around the clock and that its intake population is characterized by acute substance intoxication and withdrawal;

b. A corporate policy of delegating to non-medical corrections officers the initial determination whether a detainee requires medical attention, including during the hours when no clinician is present, and of according those officers a degree of discretion that is unreviewed by any medical professional;

c. A corporate policy or custom under which detainees whose presentation is behaviorally difficult are managed by correctional staff as a security matter rather than assessed by clinical staff as a medical matter;

d. A corporate policy or custom of failing to require, perform, or document the written medical, dental, substance abuse and mental health receiving screening mandated by Ohio Adm.Code 5120:1-8-09(C) within six hours of a detainee's arrival, and of failing to obtain or record vital signs on detainees presenting with acute intoxication or altered mental status;

e. A corporate policy or custom of failing to train contracted clinical personnel, and the correctional personnel who serve as the first point of contact in their absence, on the recognition of acute stimulant toxicity, metabolic emergency, and cardiac complaints, and on the criteria for transferring such a detainee to a hospital. See *Shadrick v. Hopkins County*, 805 F.3d 724, 737-40 (6th Cir. 2015).

f. A policy, practice, or custom of inadequate medical intake screening of arrestees exhibiting signs of drug toxicity or cardiovascular distress;

g. A policy, practice, or custom of understaffing jail medical services such that qualified medical personnel were unavailable to assess or treat inmates during a substantial portion of each day;

h. A policy, practice, or custom of failing to train contracted medical personnel on the recognition and treatment of acute methamphetamine toxicity, metabolic acidosis, and rhabdomyolysis; and

i. A policy, practice, or custom of discouraging or delaying transfer of inmates to hospital emergency departments in order to minimize corporate cost.

**119.** These corporate policies, customs, and practices were the moving force behind the deliberate indifference to Mr. Evangelista's serious medical needs.

**COUNT IV**

**42 U.S.C. § 1983 – Supervisory Liability**

(Against Sheriff Lape, Chief Deputy Jared Collins, Chief Deputy Scott Ervin, and Lieutenant Jeffrey Reed II, each in his individual capacity)

**120.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**121.** Sheriff Lape, as the chief law enforcement officer of Fairfield County and the policymaker responsible for the operation of the Fairfield County Jail, was responsible for ensuring that the jail's medical intake, monitoring, and emergency-response practices complied with the United States Constitution and with the mandatory Minimum Standards for Jails in Ohio codified at Ohio Administrative Code 5120:1-8-09.

**122.** Sheriff Lape actively and implicitly authorized, approved, and knowingly acquiesced in the unconstitutional conduct that caused Mr. Evangelista's death. See *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016). Upon information and belief, prior to September 2024, Sheriff Lape had actual knowledge of a systemic breakdown in the Fairfield County Jail's medical-care practices, including the systematic failure of jail staff and of the contracted medical provider's personnel to perform compliant medical receiving screenings, the systematic under-documentation or non-performance of safety checks, and

the treatment of acutely intoxicated arrestees as disciplinary rather than medical emergencies.

**123.** Rather than fulfill his supervisory duty, Sheriff Lape abdicated his policymaking responsibility in the face of this actual knowledge. Upon information and belief, he ratified or tolerated the non-performance of mandatory intake screenings, declined to enforce compliance with Ohio Administrative Code 5120:1-8-09, and permitted the contracted medical provider to operate within the jail under contractual arrangements that he knew or should have known were structurally inadequate to protect the constitutional rights of inmates.

**124.** Sheriff Lape's knowing acquiescence and policy abdication were active unconstitutional conduct in his individual capacity, not merely a passive failure to act, and were a moving force behind the constitutional violations that caused Mr. Evangelista's death.

**125.** Defendants Chief Deputy Jared Collins and Chief Deputy Scott Ervin, as the ranking command officers of the Fairfield County Sheriff's Office beneath the Sheriff, shared responsibility for the operation of the Fairfield County Jail and for the promulgation, enforcement, and periodic audit of its policies. Upon information and belief, each had actual knowledge, prior to September 2024, that the Jail's personnel routinely did not perform the written medical receiving screening required by Ohio Adm.Code 5120:1-8-09, routinely did not document well-being checks, and routinely resolved detainee medical presentations as behavioral or disciplinary matters without medical involvement. Neither took corrective action. Each thereby abandoned the specific duties of his position in the face of actual knowledge of a breakdown in the proper workings of the Jail, and each possessed knowledge of a potential danger to a particular class of persons of which Mr.

Evangelista was a member. *Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472, 488-89 (6th Cir. 2020).

**126.** The conduct of Defendants Collins and Ervin was not a passive failure to act. Each affirmatively authorized, approved, or knowingly acquiesced in the policies, practices, and customs under which Mr. Evangelista was booked without a medical screening, held for more than seventeen hours without a single vital sign, sprayed twice with a chemical agent to which he did not react, strapped into a restraint chair for more than four hours, and left to collapse alone in a cell. That authorization and acquiescence was a moving force behind the constitutional violations that caused his death.

**127.** Defendant Lieutenant Jeffrey Reed II, as the Administrator and Commander of the Fairfield County Jail, was responsible for the day-to-day operation of the Jail and for the promulgation, implementation, and enforcement of its written policies governing medical receiving screening, well-being and safety checks, use of the restraint chair and its time limits, decontamination following chemical-agent deployment, and the criteria for summoning outside medical assistance or transferring a detainee to a hospital. Upon information and belief, Defendant Reed authored or approved those policies, or maintained the absence of them, and knew that the personnel under his command routinely did not perform the medical receiving screening required by Ohio Adm.Code 5120:1-8-09 and did not document well-being checks as required. He abandoned the specific duties of his position in the face of actual knowledge of a breakdown in the proper workings of the Jail. His subordinates acted in conformity with the policies he authored or the policy vacuum he permitted, and Mr. Evangelista died as a result.

## COUNT V

**State Law Wrongful Death (Ohio Revised Code § 2125.01)**

(Against Sheriff Lape, Chief Deputy Collins, Chief Deputy Ervin, Lieutenant Reed, Deputy Thomson, Officer Kunkler, Officer Factor, Officer Talbott, Officer Vanhorn, Corporal Reeves, Officer Brentlinger, Jane Doe Shift Supervisor, John/Jane Doe Deputies 1-10, John/Jane Doe Corrections Officers 1-10, and John/Jane Doe Medical Staff 1-5, each in their individual capacities; and against Premier Physician Services, Inc. and TeamHealth, LLC)

**128.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**129.** Pursuant to Ohio Revised Code § 2125.01 et seq., Plaintiff brings this wrongful death claim on behalf of Mr. Evangelista's statutory beneficiaries.

**130.** Plaintiff's state-law claims are brought against corrections officers, deputies, and their employers for the failure to obtain medical care for a detainee, and not for the negligent rendition of professional medical services. They are therefore not "medical claims" within the meaning of Ohio Rev. Code § 2305.113(E)(3). In any event, the affidavit-of-merit requirement of Ohio Civ.R. 10(D)(2) is a state procedural rule that does not apply in federal court, where Fed. R. Civ. P. 8 and 9 govern the form of pleadings. *Gallivan v. United States*, 943 F.3d 291 (6th Cir. 2019).

**131.** The individual Defendants are stripped of statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(b) because their acts and omissions were committed with malicious purpose, in bad faith, and in a wanton and reckless manner. Ohio law does not require a showing that a defendant had actual, subjective knowledge of a known or obvious risk of harm in order to conclude that he acted recklessly; the standard is objective and is similar to the standard governing a federal deliberate-indifference claim. *Mercer v. Athens County*, 72 F.4th 152, 165 (6th Cir. 2023); see *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711. The failure of jail staff and medical personnel to provide any medical assessment, vital-sign monitoring, or documented well-being check over a continuous

seventeen-hour period, for a man exhibiting acute and unmistakable physiological distress, constituted wanton misconduct, the complete failure to exercise any care whatsoever in circumstances where there was a great probability of severe harm or death. Separately and independently, Defendant Thomson's decision to bypass emergency medical care despite Mr. Evangelista's explicit complaint of a heart attack, and the repeated use of chemical spray and physical force on a man who was visibly decompensating, constituted reckless conduct and evidenced bad faith and a malicious purpose.

**132.** Defendants, through their wanton and reckless conduct, directly and proximately caused the death of Chad Michael Evangelista.

**133.** As a direct and proximate result of Defendants' conduct, Mr. Evangelista's statutory beneficiaries have suffered and continue to suffer damages including, but not limited to, loss of support, loss of services, loss of society, loss of companionship, and mental anguish.

**COUNT VI**

**State Law Survival Claim (Ohio Revised Code § 2305.21)**

(Against Sheriff Lape, Chief Deputy Collins, Chief Deputy Ervin, Lieutenant Reed, Deputy Thomson, Officer Kunkler, Officer Factor, Officer Talbott, Officer Vanhorn, Corporal Reeves, Officer Brentlinger, Jane Doe Shift Supervisor, John/Jane Doe Deputies 1-10, John/Jane Doe Corrections Officers 1-10, and John/Jane Doe Medical Staff 1-5, each in their individual capacities; and against Premier Physician Services, Inc. and TeamHealth, LLC)

**134.** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**135.** Pursuant to Ohio Revised Code § 2305.21, Plaintiff brings this survival action to recover damages for the injuries and conscious pain and suffering Mr. Evangelista endured as a result of Defendants' conduct. To the extent any Defendant contends that a shorter limitations period applies to any portion of this claim, that period was tolled by Defendants'

withholding of the records and identities described herein, which prevented Plaintiff from discovering and asserting the claim against the responsible persons.

**136.** The individual Defendants are stripped of statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(b) because their acts and omissions were committed with malicious purpose, in bad faith, and in a wanton and reckless manner. *Mercer v. Athens County*, 72 F.4th 152, 165 (6th Cir. 2023); *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711. The seventeen-hour absence of any medical assessment, vital-sign monitoring, or documented well-being check constituted the complete failure to exercise any care whatsoever toward Mr. Evangelista in circumstances where there was a great probability of severe harm or death, and Defendant Thomson's conscious decision to transport him to a jail rather than to a hospital after he stated he was having a heart attack constituted conscious disregard of an obvious, life-threatening risk.

**137.** For approximately seventeen hours before his cardiac arrest, Mr. Evangelista suffered the physical pain and mental anguish of his untreated medical emergency, including but not limited to the effects of metabolic acidosis, muscle breakdown, and progressive organ failure, all while his pleas for help were ignored.

**138.** For substantial portions of his detention, Mr. Evangelista was conscious and aware of his deteriorating condition and of the fact that his pleas for help had gone unanswered.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and award the following relief:

A. Compensatory damages in an amount to be determined at trial, including but not limited to damages for Mr. Evangelista's pain and suffering, mental anguish, and pre-death conscious suffering;

B. Damages for loss of support, services, society, and companionship, and for funeral and burial expenses, suffered by Mr. Evangelista's statutory beneficiaries;

C. Punitive damages against the individual Defendants and against Premier Physician Services, Inc. and TeamHealth, LLC, on the claims for which punitive damages are available by law (the claims under 42 U.S.C. § 1983 and the survival claim, and not the wrongful-death claim), and not against Fairfield County, in an amount sufficient to punish and deter similar conduct;

D. Attorney's fees and costs pursuant to 42 U.S.C. § 1988;

E. Pre-judgment and post-judgment interest as allowed by law;

F. Leave to conduct immediate discovery, and an order directing Defendant Sheriff Lape and Defendant Fairfield County to identify by name, rank, badge or employee number, and employer every deputy, corrections officer, nurse, medical assistant, physician assistant, and physician who had contact with or responsibility for Chad Michael Evangelista between 4:00 p.m. on September 7, 2024 and 11:00 a.m. on September 8, 2024, including the female shift supervisor and the jail nurse identified herein as Jane Doe Defendants;

G. Declaratory and injunctive relief against Fairfield County enjoining its unlawful policies, practices, and customs, and ordering the institution of policies, procedures, and training for the Fairfield County Jail sufficient to bring them

into compliance with constitutional standards and with Ohio Administrative Code Chapter 5120:1-8;

H. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*Rachel A. Rinehardt*
John K. Rinehardt (0037394)
Melanie S. Fahey (0062118)
Rachel A. Rinehardt (0097825)
Sarah A. Paul (0106140)
RINEHARDT LAW FIRM
2404 Park Avenue West
Mansfield, OH 44906
(419) 529-2020; fax: (419) 529-2717
john@lawfirm2020.com
melanie@lawfirm2020.com
rachel@lawfirm2020.com
*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38(b).

*Rachel A. Rinehardt*
John K. Rinehardt (0037394)
Melanie S. Fahey (0062118)
Rachel A. Rinehardt (0097825)
Sarah A. Paul (0106140)
RINEHARDT LAW FIRM
2404 Park Avenue West
Mansfield, OH 44906
(419) 529-2020; fax: (419) 529-2717
john@lawfirm2020.com
melanie@lawfirm2020.com
rachel@lawfirm2020.com
*Attorneys for Plaintiff*